INTER-AMERICAN ORANGE CRUSH CO., demandante y recurrente, *v.* SECRETARIO DE HACIENDA, demandado y recurrido.

Número 11609.

*Sometido:* 11 de junio de 1956. *Resuelto:* 30 de abril de 1959.

*Manuel García Cabrera* y *Luis F. Cuyar,* abogados de la recurrente; *Hon. Secretario de Justicia Hiram R. Cancio (José Trías Monge, ex-Secretario de Justicia* y *Arnaldo P. Cabrera, Procurador Auxiliar,* en el alegato) y *J. C. Santiago Matos, Procurador Auxiliar,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del Tribunal.

La demandante es una corporación extranjera autorizada a hacer negocios en Puerto Rico. Durante los años 1947 a 1949, ambos inclusive, vendió a sus concesionarios en Argentina, Venezuela y Cuba ingredientes para manufacturar los concentrados de ciertas bebidas gaseosas. La venta de dichos productos se llevó a cabo en Puerto Rico, es decir, aquí se transmitió el título sobre la mercancía. De conformidad con lo estipulado en varios contratos que se celebraron muchos años antes entre la demandante y sus concesionarios, éstos venían obligados a pagar cierto precio por los ingredientes. Pero además aparecían pagando otras sumas por el uso o por el privilegio de usar en Argentina, Venezuela y Cuba las mar-

cas de fábrica y las marcas registradas que pertenecían a la demandante. La cuestión planteada es si las sumas pagadas por este último concepto eran rentas o cánones (*royalties*) que deben considerarse como ingresos derivados de fuentes fuera de Puerto Rico y excluirse del ingreso bruto de la demandante, o si, por el contrario, dichos pagos constituían en verdad parte del precio de venta de los ingredientes que deben considerarse como ingresos derivados de fuentes dentro de Puerto Rico e incluirse en el cómputo del ingreso bruto.

■■ La Ley de Contribuciones sobre Ingresos de 1924, aplicable a los tres años en controversia, disponía que se tendrán por ingresos derivados de fuentes radicadas *dentro de Puerto Rico*, entre otras, las siguientes partidas del ingreso bruto de una corporación extranjera autorizada a hacer negocios en Puerto Rico: "Rentas o cánones (*royalties*) de propiedad radicada en Puerto Rico o de cualquier interés en tal propiedad, incluyendo rentas o cánones (*royalties*) por el uso, o por el privilegio de usar en Puerto Rico, patentes, derechos de propiedad literaria, fórmulas y procedimientos secretos, crédito o reputación de un negocio (*good will*), marcas de fábrica, marcas registradas, con que se presentan productos al mercado, franquicias y cualquier otra propiedad similar. *Disponiéndose*, que las cantidades recibidas de la Administración de Ajuste Agrícola Federal, o cualquier otra agencia del Gobierno Federal o del Gobierno de Puerto Rico como pagos de beneficios o como compensación en concepto de cuotas por reducción en la producción agrícola, serán incluídas en el término 'ingreso bruto'." Sec. 19(*a*), Leyes, 1925, págs. 401, 449–51; 13 L.P.R.A. sec. 698(*a*). A la inversa, se excluía del ingreso bruto de una corporación extranjera autorizada a hacer negocios en Puerto Rico, como ingresos derivados de fuentes *fuera de Puerto Rico*, las siguientes partidas entre otras: "Rentas o cánones (*royalties*) derivados de la propiedad, incluyendo rentas o cánones (*royalties*) por el uso o por el privilegio de usar fuera de Puerto Rico, patentes, derechos de propiedad literaria, fórmulas y procedimientos secretos,

crédito o reputación de un negocio (*good will*), marcas de fábrica, marcas registradas con que se presentan productos al mercado, franquicias, y cualquiera otra propiedad similar." Sec. 19(*c*), Leyes, 1925, págs. 401, 451–53; 13 L.P.R.A. sec. 698(*c*).

Aunque estas definiciones de lo que constituía "ingreso bruto" aparecen en la sec. 19, que se refiere al caso de un "individuo no residente que no sea ciudadano de Puerto Rico", la sec. 31(*b*) de la Ley establece específicamente que: "En el caso de una corporación extranjera, 'ingreso bruto' significa solamente ingreso bruto derivado de fuentes radicadas en Puerto Rico, determinado (excepto en el caso de compañías de seguro sujetas a la contribución impuesta por la sección 41 ó 44) en la forma dispuesta en la sección 19." Leyes, 1925, págs. 401, 477; 13 L.P.R.A. sec. 734. Asimismo, a tenor con la sec. 32(*b*) de la ley: "En el caso de una corporación extranjera las deducciones admisibles a virtud de la subdivisión (*a*) [para computar el ingreso neto] serán admitidas solamente en cuanto estén relacionadas con ingresos derivados de fuentes radicadas en Puerto Rico; y la adecuada repartición y asignación de las deducciones con respecto a fuentes de ingreso radicadas en y fuera de Puerto Rico será determinada según se dispone en la sección 19 mediante reglas y reglamentos prescritos por el Tesorero [Secretario de Hacienda]." Leyes, 1925, págs. 401, 483; 13 L.P.R.A. sec. 735(*b*). En consecuencia son aplicables a una corporación extranjera que hace negocios en Puerto Rico todas las disposiciones contenidas en la sec. 19 de la Ley, con miras a determinar qué partidas deben reputarse como ingresos derivados de fuentes fuera o dentro de Puerto Rico y excluirse o incluirse al computar su "ingreso bruto". Así lo reconoce el art. 200 del Reglamento núm. 1 del Departamento de Hacienda, indicando expresamente que: "El método que se aplica para prorratear el ingreso de individuos no residentes que no sean ciudadanos de Puerto Rico debe también aplicarse

a las corporaciones extranjeras en virtud de las secciones 31 (*b*) y 32 (*b*) de la ley."

Por otro lado, no cabe duda que bajo el párrafo (*e*) de la referida sec. 19 de la ley, los ingresos de una corporación extranjera provenientes de la venta de propiedad mueble (*tangible personal property*) debían ser distribuídos, como derivados de fuentes radicadas en o fuera de Puerto Rico, de acuerdo con el método de prorrateo provisto en el art. 200 del Reglamento núm. 1 del Departamento de Hacienda. Cf. *San Juan Trading Co., Inc.* v. *Secretario de Hacienda,* 80 D.P.R. 807 (1958). En efecto, los ingresos derivados de la venta de propiedad mueble no figuran expresamente incluídos en el ingreso bruto como "ingreso derivado de fuentes radicadas dentro de Puerto Rico", según el párrafo (*a*) de la sec. 19, ni tampoco figuran expresamente excluídos del ingreso bruto como "ingresos derivados de fuentes fuera de Puerto Rico," según el párrafo (*c*) de la sec. 19. (¹) De modo que, cuando se

---

(¹) Adviértase que el párrafo (*a*) (5) de la sec. 19 dice así: "Ganancias, beneficios, e ingresos derivados de la venta de propiedad *inmueble* radicada en Puerto Rico." (Bastardilla nuestra.) Leyes, 1925, págs. 401, 451. El texto en inglés de la ley coincide: "Gains, profits, and income from the sale of *real property* located in Puerto Rico." Ibidem. Sin embargo, por un error de imprenta, ese párrafo (*a*) (5) de la sec. 19 aparece en las Leyes de Puerto Rico Anotadas diciendo exactamente lo contrario: "Ganancias, beneficios, e ingresos derivados de la venta de propiedad *mueble* radicada en Puerto Rico." (Bastardilla nuestra.) Téngase en cuenta además que en el párrafo (*c*) (5) de la sec. 19 se habla de "Ganancias, beneficios, e ingresos derivados de la venta de *propiedad* radicada fuera de Puerto Rico", como una de las partidas del ingreso bruto que se considerarán como derivadas de fuentes fuera de Puerto Rico. Pero hay que entender que se trata únicamente de la venta de *propiedad inmueble* radicada fuera de Puerto Rico. En efecto, el texto inglés de la sec. 19 (*c*) (5) lee así: "Gains, profits, and income from the sale of *real property* located without Puerto Rico." No se trata de un error en el texto inglés de la Ley, ya que la sec. 217 (*c*) (5) del Revenue Act de 1921, que sirvió de modelo a nuestra Ley de Contribuciones sobre Ingresos de 1924, se refería a "sale of *real property* located without the United States." Véase Barton, *Federal Income and Estate Tax Laws* (2a ed. 1925) 120-28. La ley federal de 1921 distinguía el caso de ingresos derivados de la manufactura y venta del caso de ingresos derivados de meras operaciones de compra y venta. Disponía que: "Ganancias, beneficios e ingresos derivados de la compra de propiedad mueble dentro y su venta fuera de los Estados Unidos o de la compra de

trata de ingresos derivados de la venta de propiedad mueble, hay que atenerse a lo dispuesto en el párrafo (*e*) de la sec. 19: "Partidas de ingreso bruto, gastos, pérdidas y deducciones que no sean los especificados en las subdivisiones (*a*) y (*c*), serán asignados o distribuídos como derivados de fuentes radicadas en o fuera de Puerto Rico, de acuerdo con reglamentos prescritos por el Secretario de Hacienda. Cuando partidas de ingreso bruto son separadamente asignadas a fuentes radicadas en Puerto Rico, serán deducidas (a los fines de computar el ingreso neto derivado de las mismas) los gastos, pérdidas y otras deducciones propiamente asignadas o distribuídas a las mismas, y una parte proporcional de otros gastos, pérdidas u otras deducciones que no pueden ser específicamente asignadas a algunas de las partidas o clases de ingreso bruto. El remanente, si hubiera alguno, deberá ser incluído en su totalidad como ingreso neto derivado de fuentes radicadas en Puerto Rico." Leyes, 1925, págs. 401, 453; 13 L.P.R.A. sec. 698 (*e*). Por eso el art. 200 del Reglamento núm. 1 prescribía con toda claridad: "Cuando un ingreso se derive de la manufactura o venta de propiedad mueble tangible, la porción de éste atribuíble a fuentes dentro de Puerto Rico será considerada como el por ciento del total de tal ingreso que la propiedad tangible y los negocios dentro de Puerto Rico guarde con el total de la propiedad tangible y el total del negocio, determinándose los por cientos de propiedad tangible y del negocio separadamente como más adelante se dispone y calculando el promedio de los dos por cientos." (²)

---

propiedad mueble fuera y su venta dentro de los Estados Unidos, se considerarán como ingresos derivados enteramente del país en que se realizó la venta." Pero esta disposición no fue incorporada en nuestra Ley de Contribuciones sobre Ingresos de 1924. Cf. Las secs. 119, 211, 212 y 231 de la nueva Ley de Contribuciones sobre Ingresos de 1954, 13 L.P.R.A. Supl. secs. 3119, 3211, 3212 y 3231, y lo dispuesto en el reciente Reglamento relativo a dicha Ley (1958) págs. 494–510, 765–75, 783–86.

(²) En ese art. 200 se añade lo siguiente: "Con la excepción de algunas partidas, tales como ciertos intereses, beneficios de sociedades, dividendos, compensación por trabajo o servicios personales, rentas y cánones (*royalties*), ganancias provenientes de la venta de propiedad inmueble y entradas de transportación, la ley no establece una regla precisa en cuanto a qué

No obstante, siempre toca al contribuyente establecer qué parte de los ingresos derivados de la venta de propiedad mueble deben atribuirse a fuentes fuera de Puerto Rico. Si la evidencia no revela ninguna base para distribuir o prorratear el ingreso bruto, la totalidad del mismo se considera como "ingreso derivado de fuentes dentro de Puerto Rico." Véanse *Wodehouse* v. *Cmm'r.*, 177 F.2d 881 (2d Cir. 1949) y *Misbourne Pictures Ltd.* v. *Johnson*, 189 F.2d 774 (2d Cir. 1951). En este caso la demandante no adujo, ni ante el Secretario de Hacienda ni ante el Tribunal Superior, evidencia alguna que le permita invocar el método de prorrateo que establece el art. 200 del Reglamento núm. 1. Más aún: la contribuyente aquí da por sentado que si todos los pagos hechos por sus concesionarios fuesen por concepto del precio de venta de los ingredientes, habría que incluirlos en su ingreso bruto como derivados de fuentes dentro de Puerto Rico.

■ Las transacciones llevadas a cabo por la demandante con sus concesionarios en Argentina, Venezuela y Cuba se rigieron por tres contratos diferentes que se otorgaron en 1927, 1938 y 1945, respectivamente. Pero, en síntesis, se convino en todos ellos que el concesionario (*licensee*) tendría el derecho exclusivo de manufacturar, con ingredientes suministrados por la demandante, los concentrados de ciertas bebidas gaseosas y de vender dichos concentrados en el territorio de cada república bajo las marcas de fábrica (*trade-marks*) y marcas registradas (*trade-names*) pertenecientes a la demandante. Cada concesionario venía obligado a manufacturar los concentrados exclusivamente con los ingredientes que le vendiera la demandante, siguiendo para ello ciertas "fórmulas secretas" que también pertenecían a ésta. Se convino además que cada concesionario pagaría a la demandante: (1) ciertos precios fijos por cada unidad de ingredientes; y

constituirá ingresos derivados de fuentes radicadas en Puerto Rico. El ingreso neto proveniente de negocios en general será repartido o asignado a fuentes de ingreso radicadas en o fuera de Puerto Rico según reglamentos prescritos por el Tesorero."

además (2) "royalties" por el uso de las marcas de fábrica (*trade-marks*) y las marcas registradas (*trade-names*) bajo las cuales se vendían los concentrados y las bebidas gaseosas en el mercado. Dichos "royalties" se calculaban a un precio fijo por cada galón de concentrados que el concesionario manufacturaría con los ingredientes vendidos por la demandante. Se dispuso que la demandante expediría facturas por los "royalties" con cada embarque de ingredientes, que en dichas facturas se determinaría el número de galones de concentrados a base de la producción por unidad de ingredientes según la "fórmula" de la demandante, y que el concesionario pagaría dichas facturas dentro de un término de 90 días (en el caso de Argentina) y de 60 días (en los casos de Venezuela y Cuba) a contar desde la fecha de cada embarque. Los términos de duración de los contratos de la demandante con sus concesionarios son como sigue: de 99 años el de la Argentina, 75 años el de Venezuela y 49 años el de Cuba.

Originalmente dichos contratos se otorgaron a favor de la Orange-Crush Co., pero en 5 de febrero de 1946 fueron cedidos por ésta a una compañía subsidiaria de ventas, la Inter-American Orange Crush Co. Fue esta última corporación quien, como cesionaria de los contratos y dueña de las marcas de fábrica y marcas registradas con que se presentan los concentrados y las bebidas gaseosas en el mercado, llevó a cabo todas las transacciones con los concesionarios (*licensees*) de Argentina, Venezuela y Cuba durante los años de 1947 a 1949, ambos inclusive.

Desde principios de 1946, la demandante Inter-American Orange Crush Co., que siempre ha calificado como una *Western Hemisphere Trade Corporation* según las disposiciones del Código Federal de Rentas Internas, empezó a hacer negocios en Puerto Rico con la autorización del entonces Secretario Ejecutivo de Puerto Rico.(³) Así lo estipularon las

---

(³) Según la ley federal el término "Western Hemisphere Trade Corporation" significa una corporación doméstica que reune los siguientes requisitos: (*a*) sus negocios se llevan a cabo totalmente dentro de los límites

partes en este litigio. Los negocios de la demandante con sus concesionarios en Argentina, Venezuela y Cuba se llevaban a cabo en la forma siguiente: (1) La oficina de Puerto Rico recibía las órdenes de los concesionarios y transmitía las mismas a la oficina principal de la demandante en Chicago. (2) La oficina principal hacía los embarques exportando directamente desde los Estados Unidos los ingredientes sin que éstos pasaran por Puerto Rico. (3) De conformidad con los conocimientos de embarques y las facturas, en las ventas de mercancía así exportada el título sobre los ingredientes se transfería a los concesionarios en Puerto Rico. (4) La oficina principal hacía tres facturas para cada embarque de ingredientes: una que aparecía expedida en Chicago cargando el precio por los ingredientes que la Orange Crush (compañía manufacturera) había cobrado a la demandante en Puerto Rico; otra que aparecía expedida en San Juan cargando al concesionario el precio de venta estipulado en los contratos para los ingredientes; y una tercera que también aparecía expedida en San Juan cargando al concesionario los "royalties" por galones de concentrado a manufacturarse

---

geográficos de Norte, Centro y Sur América, o en las Antillas (excepto compras incidentales de menor cuantía); (*b*) 95 por ciento o más de su ingreso bruto durante el período de tres años anterior al cierre del año contributivo (o durante aquella parte de ese período en que la corporación existía) se deriva de fuentes fuera de Estados Unidos; y (*c*) 90 por ciento o más de su ingreso bruto durante dicho período o parte del mismo se deriva de la operación activa de un comercio o negocio. Véanse 8 Mertens, *Federal Income Taxation* (Zimet rev. ed.) sec. 45.76; Rudick y Allen, *Tax Aspects of Operations Under the Puerto Rican Exemption Program*, 7 Tax. L. Rev. 403 (1952); Silverson, *Corporations in Foreign Trade and Income Taxes*, N.Y.U. Fourth Ann. Inst. on Fed. Taxation, 647 (1946); Seghers, *How Americans Can Best Do Business Abroad and Foreigners Best Do Business Here*, N.Y.U. Sixth Ann. Inst. on Fed. Taxation 926 (1948); Baker y Meek, *Tax Problems of Doing Business Abroad: Some Practical Considerations*, 1957 Wis. L. Rev. 73; y Dean, *The Current Importance of Western Hemisphere Trade Corporations*, N.Y.U. Tenth Ann. Inst. on Federal Taxation 489 (1952). Se ha resuelto que Puerto Rico es un país del hemisferio occidental a los fines de la sec. 921 del Código Federal de Rentas Internas de 1954, que establece los requisitos para calificar como una *Western Hemisphere Trade Corporation* y que corresponde a la sec. 109 del Código Federal de 1939. Véase: IT 3748, CB 1945, pág. 152.

con los ingredientes según la fórmula de la demandante. (5) Esas tres facturas y el correspondiente conocimiento de embarque para cada despacho de ingredientes se remitían a la oficina de la demandante en San Juan. (6) El agente fiscal a cargo de la oficina de San Juan hacía un giro que enviaba a un banco en Puerto Rico junto con los conocimientos de embarque, para que éste como cobrador percibiera lo adeudado por el concesionario en Argentina, Venezuela o Cuba, y luego entregara el dinero percibido a la oficina de la demandante en San Juan. Por supuesto, estos cobros incluían tanto el importe de la factura por el precio de venta de los ingredientes como el importe de la factura por los "royalties" cargados al concesionario. (7) Finalmente el dinero recibido en San Juan se remitía a la oficina principal de la demandante en Chicago.([3a])

Los concesionarios de la demandante durante los años en controversia se dedicaban, de acuerdo con los contratos antes mencionados y con la prueba presentada, a preparar o manufacturar los concentrados con los ingredientes que les vendía la Inter-American Orange Crush Co. Luego vendían en el territorio de cada república dichos concentrados que constituían las bebidas gaseosas. Aparentemente los concesionarios también llevaban a cabo la operación de embotellar los concentrados. En todo caso, los concesionarios vendían en sus respectivos mercados los concentrados de bebidas gaseosas bajo las marcas de fábrica (*trade-marks*) y marcas registradas (*trade-names*) que pertenecían a la Inter-American Orange Crush Co. Debido a restricciones impuestas por el gobierno argentino sobre la exportación de dólares, la deman-

---

([3a]) Obsérvese lo siguiente: ambas partes admitieron que el título sobre los ingredientes vendidos a los concesionarios se transmitía en Puerto Rico. Así, este caso no plantea ningún problema respecto al sitio donde ocurrió el traspaso del título. Cf. *United States* v. *Balanovski*, 236 F.2d 298, 305–307 (2d Cir. 1956); Nota en 69 Harv. L. Rev. 567; Wender, *Doing Business Abroad in Corporate Form*, Ninth Tax Institute Univ. of S. Calif. (1957) 139; y 8 Mertens, *Federal Income Taxation* (Zimet rev. ed.) secs. 45.38 y 45.39.

dante se vio obligada a no vender más ingredientes a su concesionario en la República Argentina desde mayo de 1948 en adelante. Se procedió entonces a modificar el contrato original, eliminando la cláusula que disponía: "El concesionario ('licensee') conviene en manufacturar los concentrados exclusivamente a base de los ingredientes que suministrará la compañía." El concesionario en Argentina continuó fabricando, con ingredientes comprados por él en dicha nación, los concentrados de las bebidas gaseosas y vendiendo éstos bajo las marcas de fábrica y marcas registradas pertenecientes a la demandante. No obstante, después de mayo de 1948 el concesionario argentino siguió pagando a la demandante los "royalties" acordados en el contrato original.

Durante los años 1947, 1948 y 1949, la demandante también hacía negocios en la República Dominicana, en las Islas Bahamas, y en las Islas Vírgenes. Pero en estos países no vendía los ingredientes sino los concentrados de las bebidas gaseosas, listos para ser embotellados. Y en las ventas que hacía en la República Dominicana, en las Islas Bahamas, y en las Islas Vírgenes, la demandante no cobraba "regalías" por el uso de sus marcas de fábrica. Lo único que recibía era el precio de venta por los concentrados de las bebidas gaseosas. En los registros de ventas y libros de contabilidad de la demandante durante los años aquí en controversia, no se desglosaron en asientos separados los ingresos recibidos por concepto de "regalías" y los ingresos recibidos como precios de venta de los ingredientes. Además, en su primera planilla de contribución sobre ingresos referente al año 1946, la demandante incluyó en su ingreso bruto todos los pagos recibidos de Argentina, Venezuela y Cuba, sin excluir como ingresos de fuentes fuera de Puerto Rico lo que había recibido en concepto de "regalías" de acuerdo con los contratos antes mencionados. Se estipuló entre las partes que "en relación con muchas de las ventas de ingredientes que hiciera la querellante a sus concesionarios durante los años a que se contraen estos procedimientos, los asientos y facturas correspondientes demuestran

que se verificaron dichas ventas a un precio más bajo que aquél que pagara o se le cargara a la referida querellante por los mismos ingredientes." Según la declaración incontrovertida del Sr. Domenech, agente fiscal de la demandante en Puerto Rico, esto se debió ". . . a que se hacía muy difícil conseguir por los canales normales las materias primas para los ingredientes, y en el deseo de la compañía de no gravar a los concesionarios demasiado fuerte, ellos optaron por absorber esa partida de pérdida." Y como acertadamente manifestó el juez sentenciador en la vista, la prueba demostró que ". . . aparentemente [ésta] no era [la situación] siempre, era en algunos casos y en esos casos en que la compañía prefería absorber la diferencia."

Luego de analizar estos hechos, el tribunal de instancia resolvió que *todo* lo percibido por la demandante de sus concesionarios en Argentina, Venezuela y Cuba formaba parte del precio de venta de los ingredientes, con excepción de lo que pagó el concesionario de Argentina a partir del mes de mayo de 1948 cuando cesaron por completo las ventas de ingredientes para fabricar concentrados en ese país. Es decir, dictaminó como cuestión de derecho que la demandante nunca percibió pagos por concepto de "regalías" de dichos concesionarios, excepto durante el período comprendido entre mayo de 1948 y diciembre 31 de 1949. Las sumas pagadas por el concesionario de Argentina durante este último período sí fueron consideradas "regalías". En consecuencia, dictó sentencia declarando "sin lugar la demanda en lo que a las partidas de ingresos derivados de [Argentina] Cuba y Venezuela, en los años 1947, 1948 y 1949 atañe; pero con lugar en lo que respecta a las partidas de ingresos en concepto de regalías [derivadas de la Argentina] a partir de la fecha en mayo de 1948 desde la cual no se haya vendido ingredientes . . . en esa nación." Creemos que, a tenor con lo dispuesto en las secs. 19 y 31 de la ley aplicable, esa sentencia es errónea y debe revocarse. Tomando en cuenta todos los hechos probados, resulta obvio que las sumas pagadas a la demandante por

concepto del uso o del privilegio de usar sus marcas de fábrica (*trade-marks*) y sus marcas registradas (*trade-names*) en mercados extranjeros, constituían verdaderos e incuestionables cánones ("regalías") que deben considerarse como ingresos derivados de fuentes fuera de Puerto Rico y excluirse de su ingreso bruto.

Los términos "fuentes fuera o dentro de Puerto Rico" que usan las secs. 19 y 31 de la Ley, se refieren con todo rigor al *origen* de los ingresos. Estos se atribuyen al sitio en el cual se desarrollan las actividades o se usan o están localizadas las propiedades que rinden ganancias y utilidades. Y, en el caso de una corporación extranjera, los ingresos no son tributables si las propiedades de las cuales se derivan los mismos se usan o están localizadas fuera de Puerto Rico. La teoría básica de esta norma es que la imposición de contribuciones debe estar relacionada con la protección, oportunidades y ventajas otorgadas por el estado a las propiedades y actividades que engendran las ganancias, utilidades y otros ingresos. Véanse *P. R. Telephone Co.* v. *Secretario de Hacienda*, 79 D.P.R. 895 (1957) y 8 Mertens, *op. cit.*, supra, sec. 45.27. Respecto a cánones (*regalías*), como hemos visto anteriormente, la Ley de 1924 prescribe expresamente que la "fuente" de dichos ingresos depende del sitio donde real y efectivamente se use la propiedad intangible que los produce. Si el uso tiene lugar en Puerto Rico, los cánones se atribuyen a "fuente dentro de Puerto Rico". En cambio, si la propiedad intangible se usa en un país extranjero, las ganancias y utilidades percibidas se consideran como ingresos derivados de "fuentes fuera de Puerto Rico". Las marcas de fábrica (*trade-marks*) y las marcas registradas (*trade-names*) con que se presentan productos al mercado, se mencionan específicamente en la ley como propiedades intangibles que pueden producir ingresos dentro o fuera de Puerto Rico, según el sitio en que las mismas sean usadas por una corporación extranjera autorizada a hacer negocios en nuestro país. Ni el sitio donde se celebra el contrato para el pago de las regalías, ni el

sitio donde el contribuyente recibe los ingresos, determinan la "fuente" o el origen de los mismos. La regla es clara: las regalías pagadas por el uso o por el privilegio de usar derechos de propiedad literaria (*copyrights*), marcas de fábrica (*trade-marks*), marcas registradas (*trade-names*), etcétera, tienen su "fuente" en el país donde se venden las obras literarias o los productos que sean objeto de tales derechos intangibles de propiedad. Allí es que éstos rinden ganancias y utilidades. Cf. *Comm'r.* v. *Wodehouse*, 337 U. S. 369 (1949); *Bloch* v. *United States*, 200 F.2d 63 (2d Cir. 1952); *Misbourne Pictures Ltd.* v. *Johnson*, 189 F.2d 774 (2d Cir. 1951); *Rohmer* v. *Comm'r.*, 153 F.2d 61 (2d Cir. 1946); *Sabatini* v. *Comm'r.*, 98 F.2d 753 (2d Cir. 1938); Allan & Coggan, *Aliens and the Federal Income Tax*, 7 Tax L. Rev. 253 (1950); 8 Mertens, *op. cit.* supra, secs. 45.27–45.36; *Source of Income as Within or Without the United States Under the I.R.C.*, 160 A.L.R. 559 (1946); 3 P–H Federal Taxes (1959) secs. 16,295C–16,389.

■ Por supuesto, en sus contratos con los concesionarios de Argentina, Venezuela y Cuba la demandante hubiese podido incluir en el precio de venta de los ingredientes una suma equivalente al total de las "regalías" y así ceder gratuitamente el uso de sus marcas de fábrica y de sus marcas registradas con las cuales se vendían los concentrados en el mercado.[4] Pero es un hecho innegable que ese no fue el convenio con ninguno de los concesionarios en dichos países. Al contrario, se fijó específicamente en forma separada y distinta (1) un precio firme de venta por los ingredientes, y (2) ciertos cánones o "regalías" por el uso de marcas de fábrica y marcas

---

[4] Precisamente esto fue lo que hizo la Inter-American Orange Crush Co. al exportar *concentrados* (no ingredientes) a otros mercados extranjeros: a la República Dominicana, a las Islas Bahamas y a las Islas Vírgenes. En *Sánchez* v. *Comm'r.*, 162 F.2d 58 (2d Cir. 1947) en vez de convenir el pago de "regalías" por el uso de una patente en mercados extranjeros, el inventor otorgó a una corporación doméstica una concesión exclusiva a cambio de un por ciento de las ventas de los productos objeto de la patente dentro y fuera de los Estados Unidos. Se llevaban libros separados de cuentas para la venta de los productos en los Estados Unidos

registradas que eran propiedad de la Inter-American Orange Crush Co. La realidad es que dichas marcas de fábrica y marcas registradas tenían un valor considerable para presentar al mercado y vender los concentrados de bebidas gaseosas. No hay duda que de hecho los concesionarios usaron las referidas marcas para presentar al mercado los concentrados. Y todas las transacciones entre la Inter-American Orange Crush Co. y sus concesionarios reflejan la existencia real y efectiva de las "regalías". Así por ejemplo: después que cesaron por completo las ventas de ingredientes al concesionario de Argentina, éste siguió pagándole a la demandante exactamente las mismas "regalías" por el uso de las marcas. Dejó de pagar únicamente el precio estipulado para los ingredientes porque en vez de comprárselos a la demandante los adquiría localmente en Argentina. Así pues, resulta imposible calificar las *regalías* pagadas como *"parte del precio de venta de los ingredientes."*

Frente a esos hechos indubitados, carece de importancia el método estipulado para computar o medir las "regalías". Éstas se calculaban, como hemos señalado, a base de un precio fijo por cada galón de concentrados que el concesionario podía manufacturar con los ingredientes vendidos. La demandante expedía facturas por las "regalías" con cada embarque de ingredientes, ya que era fácil determinar el número de galones de concentrados que produciría cada unidad de ingredientes. Los concesionarios pagaban dichas facturas por las "regalías" dentro de un término de 90 días (en el caso de Argentina) y de 60 días (en los casos de Venezuela y Cuba) a contar desde la fecha de cada embarque. El Tribu-

---

y la venta de productos fuera de los Estados Unidos. Sin embargo, la Corte de Circuito resolvió que todos los ingresos recibidos por el dueño de la patente eran de fuentes dentro de los Estados Unidos, señalando que: "Todo lo que [él] hubiese podido percibir en concepto de 'regalías' por el uso de sus patentes [en el extranjero] fue renunciado cuando a los compradores se les permitió, aparentemente como estímulo para que pagasen el precio de venta cargado, usar esas patentes gratuitamente. Y por eso el demandante . . . no percibió nada por el uso de una propiedad en el extranjero." (Pág. 59.)

nal Superior concluyó que este método de pago de los cánones los convertía en parte del precio de venta de los ingredientes porque no se exigía, antes de cobrar las "regalías" que las marcas de fábrica y marcas registradas fueran en realidad usadas por los concesionarios. A nuestro juicio, esta afirmación del tribunal sentenciador es errónea. El término "cánones por el uso o por el privilegio de usar fuera de Puerto Rico marcas de fábrica o marcas registradas con que se presentan productos al mercado" se refiere o describe la clase o naturaleza del ingreso y no la forma en que se hace el pago. Véanse *Sabatini* v. *Comm'r.*, 98 F.2d 753, 755 (2d Cir. 1938) y *Rohmer* v. *Comm'r.*, 153 F.2d 61, 63 (2d Cir. 1946). Aunque las "regalías" se pagaran por adelantado y su importe se midiera por el número de unidades de ingredientes que se vendían en Puerto Rico, no hay duda de que constituían ingresos derivados del uso de propiedad intangible en mercados extranjeros. Este carácter del ingreso es lo que determina su "fuente". Cf. *Comm'r* v. *Piedras Negras Broadcasting Co.*, 127 F.2d 260 (5th Cir. 1942) y *British Timken Ltd.*, 12 T. C. 880 (1949). Por lo demás, aquí el método para computar los pagos por concepto de cánones dependía en última instancia de las ventas de concentrados de bebidas gaseosas que hacían los concesionarios en Argentina, Venezuela y Cuba bajo las marcas de fábrica y marcas registradas pertenecientes a la demandante. Cf. *Comm'r* v. *Wodehouse*, 337 U. S. 369 (1949) y 8 Mertens, *op. cit.*, supra, secs. 45.27–45.36.

■ El Secretario de Hacienda hace hincapié en dos hechos: (1) que en los registros de venta y libros de contabilidad de la demandante no se desglosaron en asientos separados los ingresos recibidos por concepto de "regalías" y los ingresos recibidos como precios de venta de los ingredientes; y (2) que la demandante en su planilla de 1946 incluyó en su ingreso bruto todos los pagos recibidos de Argentina, Venezuela y Cuba, sin excluir como ingresos de fuentes fuera de Puerto Rico lo que había recibido en concepto de "regalías".

Ni que decir hay que la determinación del ingreso tributable ". . . descansa en hechos ciertos y no en teorías, tecnicismos o entradas en libros de contabilidad." *Loíza Sugar Co.* v. *Domenech, Tes.,* 44 D.P.R. 556, 562 (1933); *Domingo Velasco & Co.* v. *Sancho Bonet, Tes.,* 51 D.P.R. 56, 58 (1937); *Fernández* v. *Domenech, Tes.,* 53 D.P.R. 802, 808 (1938) y *Buscaglia, Tes.* v. *Tribunal de Contribuciones,* 67 D.P.R. 66, 69 (1947). No podemos determinar el ingreso bruto de la demandante a base de errores en la forma de llevar sus registros de ventas y sus libros de cuentas. Estos constituyen evidencia, pero no son indispensables ni concluyentes a favor o en contra del contribuyente o del Secretario de Hacienda. Véanse *Helvering* v. *Midland Mut. Life Ins. Co.,* 300 U. S. 216 (1937); *Doyle* v. *Mitchell Bros. Co.,* 247 U. S. 179 (1918); *Comm'r* v. *Union Pacific R. Co.,* 86 F.2d 637 (2d Cir. 1936); *Wassel* v. *United States,* 49 F.2d 137 (8th Cir. 1931); y 1 Mertens, *op. cit.,* supra, sec. 5.09. Idéntica regla se aplica a la planilla del contribuyente para el año 1946. Por tanto, basta señalar lo siguiente: en este caso se probó a saciedad que los asientos en los libros de contabilidad y la planilla de contribución sobre ingresos para el 1946 de la Inter-American Orange Crush Co., no reflejan los hechos reales ni la verdadera naturaleza de las transacciones con sus concesionarios en Argentina, Venezuela y Cuba. Tampoco tiene importancia que la demandante en muchos casos vendiera los ingredientes a sus concesionarios a un precio que le producía pérdidas. No hay base alguna en la prueba para concluir que en esta forma la demandante tratara de evadir el pago de contribuciones en Puerto Rico. Por el contrario, a nuestro juicio las circunstancias que provocaron estas pérdidas fueron cumplidamente explicadas por la demandante. Aparentemente ese fue también el criterio del juez sentenciador, a juzgar por el récord ante nos, aunque en su sentencia no hizo ningún pronunciamiento sobre el particular.

Siendo esto así, *debe revocarse la sentencia recurrida y en su lugar dictar otra declarando con lugar la demanda en este*

*caso y, en consecuencia, dejando sin efecto las deficiencias que el Secretario de Hacienda notificó a la Inter-American Orange Crush Co. con respecto a la contribución sobre ingresos de dicha corporación para los años 1947, 1948 y 1949.*