CARIBE CROWN CAP CORP., demandante y recurrida, *v.* SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrente.

*Número:* R-78-360          *Resuelto:* 21 de junio de 1979

*Héctor A. Colón Cruz, Procurador General,* y *Reina Colón de Rodríguez, Procuradora General Auxiliar,* abogados del recurrente; *Angel L. Calero,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A solicitud del Secretario de Hacienda, examinamos por vez primera las consecuencias tributarias en la contribución sobre ingresos de una corporación extranjera (Consolidated Cork Development Co., Inc.) que mediante contrato conviene y confiere, entre otras cosas, una licencia para compartir exclusivamente sus conocimientos técnicos especiales (*know-how*) con una empresa local (Caribe Crown Cap Corp.).

La ilustrada sala sentenciadora concluyó que los pagos ascendentes a la suma de $120,000.00 durante la vigencia de dos contratos por un período total de diez (10) años, no constituían ingresos provenientes de fuentes dentro de Puerto Rico, y por tanto, no había obligación de retener contribución en su origen y resultaban improcedentes las planillas de oficio y deficiencias notificadas.

I

El trasfondo fáctico según las determinaciones del tribunal de origen y las disposiciones contractuales pertinentes, es el siguiente: (¹) La recurrida Caribe Crown Cap Corp.—corporación inscrita y domiciliada en Puerto Rico—deseosa de establecer aquí una planta para la fabricación de tapas o chapas metálicas para envases de cristal, el 18 de enero de 1960, suscribió un contrato con Consolidated Cork Development Co., Inc.,—entidad corporativa con oficinas principales, planta y laboratorios de control en Brooklyn, New York—dedicada a

---

(¹) "No menoscabamos la regla de respeto a las determinaciones de hecho de los tribunales de instancia cuando evaluamos prueba documental, pues sobre ésta ocupamos igual posición que la de los foros primarios. . . ." *Planned Credit of P.R., Inc.* v. *Page,* 103 D.P.R. 245, 262–263 (1974).

la manufactura de tapas corona (*crown corks*). Los supuestos básicos que indujeron a Caribe a firmar dicho contrato fueron: (a) la necesidad de conocimiento *adicional* sobre los métodos y formas de fabricar las tapas; y (b) la *garantía*, prestádale por Consolidated, de que poseía la experiencia, destreza y conocimientos técnicos especiales (*know-how*) necesarios para la fabricación de las tapas por haber obtenido en sus Departamentos de Ingeniería y Desarrollo los siguientes logros: (1) diseños de *mejoras* introducidas en muchas de las máquinas fabricadas por otros; (2) diseño y desarrollo de muchas máquinas construidas en sus talleres o construidas por otros; (3) desarrollo de ciertas fórmulas y controles en su laboratorio químico *considerados superiores a aquellos usados de ordinario en la industria en general;* y (4) desarrollo de métodos para combinar o simplificar algunas operaciones de salvamento de materia residual, que de lo contrario se perdería.

En consideración a estas representaciones y premisas, Consolidated, a cambio de las sumas antes mencionadas, se obligó a compartir con Caribe sus conocimientos técnicos especiales (*know-how*), facilitándole: lista de maquinaria y equipo necesario y útil para producir diariamente un número determinado de gruesas de tapas, con los cambios o adiciones necesarios para mejorar la eficiencia; supervisar periódicamente la construcción del equipo ordenado por Caribe sin responsabilidad de Consolidated; y usar sus instalaciones y procedimientos para el control de calidad. Además, las partes acordaron que:

"La Compañía [Consolidated] conviene en poner a disposición de Caribe Crown los conocimientos técnicos especiales ('know-how') que posee, relativo al campo de la manufactura de tapas al cual Caribe Crown dedicaría, para uso exclusivo en Puerto Rico . . . .

. . . Si durante la vigencia de este convenio, la corporación adquiere cualquier patente relacionada con el campo mencionado, protegida por las leyes del Estado Libre Asociado de Puerto Rico,

conferirá a Caribe Crown (sin cargo alguno adicional) una licencia exclusiva para usar tal patente solamente dentro de Puerto Rico, durante la vigencia de este convenio."

Para lograr comunicar y suministrar a Caribe los conocimientos técnicos especiales (know-how) a ser utilizados en Puerto Rico, se proveyó: (a) que algunos de los empleados de Caribe—quien cubriría los gastos—recibieran adiestramiento en la planta de Brooklyn, New York y (b) que Consolidated enviara uno o más de sus técnicos para dar mantenimiento, controlar, ajustar o mejorar el equipo o maquinaria de la fábrica en Puerto Rico, comprometiéndose Caribe a satisfacer todos los gastos de dichos técnicos y a reembolsarle a Consolidated por la utilización de ellos aquí a razón de cierta cantidad a ser estipulada.

Para la instalación de la maquinaria, inicialmente Consolidated pondría a disposición de Caribe, y ésta utilizaría, los referidos conocimientos técnicos especiales (know-how) incluyendo planos de la planta, diseño y especificaciones. Enviaría a Puerto Rico uno o más de sus técnicos más diestros para auxiliar y supervisar la instalación del equipo en la planta y asistir y supervisar la producción inicial de tapas. Para cubrir costos y gastos de tales técnicos se pactó la suma de $5,000.00 más gastos de viaje de ida y vuelta a New York.

Se convino que de surgir algo nuevo en el campo de manufactura de tapas—que a juicio de Consolidated pudiera ser de utilidad a Caribe, o que ésta lo solicitara—se proveería dicha data. También, estipularon que durante la vigencia del contrato ésta no otorgaría acuerdos similares con ningún fabricante que pretendiese establecerse en Puerto Rico para la manufactura de tapas de botellas, como tampoco pondría a disposición sus conocimientos técnicos especiales (know-how), ni prestaría los servicios mencionados en los párrafos anteriores. Caribe se comprometió en utilizar dichos conocimientos exclusivamente dentro de Puerto Rico y a no divulgar, sin el consentimiento de Consolidated, la naturaleza de tal in-

formación o conocimientos, si éstos no hubieren sido divulgados a través de alguna patente o publicación impresa. También actuaría como agente de compañía de Caribe para lograr obtener precios más ventajosos en el mercado por razón de sus conocimientos técnicos especiales (*know-how*).

Finalmente, se convino en que Caribe pagaría la suma de $60,000.00 mediante un pago inicial de $3,000.00 al firmarse el contrato y $3,000.00 en plazos trimestrales durante los cinco (5) años de vigencia del contrato.

Al vencimiento del primer contrato—18 de enero de 1965 —las partes lo renovaron por las mismas cláusulas, términos y condiciones, salvo algunas excepciones. En este nuevo contrato, Consolidated no sólo garantizó poseer los conocimientos técnicos especiales (*know-how*), sino que consignó poseer los medios para conseguir dichos conocimientos. Se convino la misma cantidad de dinero, aunque se variaron los plazos, y se estipuló que los gastos de los técnicos de Consolidated en Puerto Rico serían satisfechos por ésta.

La sala sentenciadora concluyó lo siguiente: como resultado del contrato, un ingeniero y un mecánico de Consolidated permanecieron en Puerto Rico aproximadamente dos meses asesorando a Caribe en la construcción e instalación de la planta, por cuyos servicios Caribe pagó a Consolidated $5,583.00 y retuvo la contribución correspondiente; un ingeniero y un mecánico, empleados de Caribe, recibieron entrenamiento inicial en la planta de Consolidated en Nueva York que luego transmitieron al personal de Caribe en Puerto Rico; a este adiestramiento siguieron visitas periódicas anuales a la planta de Consolidated por personal de Caribe; además, cuando surgían problemas técnicos, Consolidated aconsejaba por teléfono o por carta a Caribe; y la calidad de las tapas coronas de Caribe era evaluada en los laboratorios de Consolidated en New York a donde se enviaban muestras dos veces a la semana.

## II

Los preceptos de la Ley de Contribuciones sobre Ingresos de Puerto Rico—Ley Núm. 91 del 29 de junio de 1954, según enmendada—que rigen este caso son: (²)

"(a) *Corporaciones y Sociedades Extranjeras no dedicadas a Industria o Negocio en Puerto Rico.*—

(1) *Regla General.*—

(A) *Imposición de la Contribución.*—Se impondrá, cobrará y pagará para cada año contributivo, en lugar de la contribución impuesta por las secs. 3013 y 3015 de este título, sobre el monto recibido por toda corporación o sociedad extranjera no dedicada a industria o negocio en Puerto Rico, *procedente de fuentes dentro de Puerto Rico,* por concepto de intereses . . . , rentas, salarios, jornales, primas, anualidades, compensaciones, remuneraciones, emolumentos, u otras ganancias, beneficios e ingresos anuales o periódicos que sean fijos o determinables, una contribución del 29 por ciento de dicho monto . . . ." Sec. 231(a), 13 L.P.R.A. sec. 3231(a).

"(a) *Ingreso Bruto de Fuentes en Puerto Rico.*—Las siguientes partidas de ingreso bruto *serán consideradas como ingreso de fuentes dentro de Puerto Rico.*

(4) *Rentas y cánones (royalties).*— Rentas o cánones (*royalties*) de propiedad situada en Puerto Rico o *de cualquier interés en dicha propiedad, incluyendo rentas o cánones (royalties) por usar o por el privilegio de usar en Puerto Rico patentes, propiedad intelectual, fórmulas y procedimientos secretos, plusvalía, marcas de fábrica, sellos de fábrica, franquicias y otra propiedad similar.*" Sec. 119(a), 13 L.P.R.A. sec. 3119(a). (Énfasis nuestro.)

"(a) *Obligación de Retener.*—En el caso de corporaciones extranjeras sujetas a tributación bajo este subtítulo no dedicadas a industria o negocio dentro de Puerto Rico se deducirá y rentendrá en el origen, en la misma forma y sobre las mismas partidas de ingreso que se proveen en la sec. 3143 de este título, una contribución igual al 29 por ciento de dicho ingreso . . . ." Sec. 144(a), 13 L.P.R.A. sec. 3144(a).

---

(²) Tienen como antecedentes las Secs. 119, 143 y 144 del Código de Rentas Internas federal de 1939.

"(a) *Obligación de Retener.*—Todas las personas, cualquiera que sea la capacidad en que actúen, . . . que tengan el control, recibo, custodia, disposición, o pago de intereses, dividendos, participación en beneficios de sociedades, rentas, salarios, jornales, primas, anualidades, compensaciones, remuneraciones, emolumentos, u otras ganancias, beneficios e ingresos anuales o periódicos que sean fijos o determinables de cualquier individuo no residente (pero solamente hasta el límite en que cualquiera de las partidas arriba mencionadas constituya ingreso bruto de fuentes dentro de Puerto Rico) deberán deducir y retener de dichas ganancias, beneficios e ingresos anuales o periódicos una cantidad igual al 29 por ciento de los mismos si el receptor fuere un extranjero . . . ." Sec. 143, 13 L.P.R.A. sec. 3143(a).

En *Inter-American Orange Crush Co.* v. *Srio. de Hacienda*, 81 D.P.R. 293, 306 (1959), expresamos:

*"Los términos 'fuentes fuera o dentro de Puerto Rico' que usan las secciones 19 y 31 de la Ley, se refieren con todo rigor al origen de los ingresos.* Estos se atribuyen al sitio en el cual se desarrollan las actividades *o se usan o están localizadas las propiedades que rinden ganancias y utilidades.* Y, en el caso de una corporación extranjera, los ingresos no son tributables si las propiedades de las cuales se derivan los mismos se usan o están localizadas fuera de Puerto Rico. La teoría básica de esta norma es que la imposición de contribuciones debe estar relacionada con la protección, oportunidades y ventajas otorgadas por el Estado a las propiedades y actividades que engendran las ganancias, utilidades y otros ingresos. Véanse *P.R. Telephone Co.* v. *Secretario de Hacienda,* 79 D.P.R. 895 (1957) y 8 Mertens, *op. cit.* supra, sec. 45.27.

Respecto a cánones (*regalías*), como hemos visto anteriormente, la Ley de 1924 prescribe expresamente que la *'fuente' de dichos ingresos depende del sitio donde real y efectivamente se use la propiedad intangible que los produce. Si el uso tiene lugar en Puerto Rico, los cánones se atribuyen a 'fuentes dentro de Puerto Rico'.* En cambio, si la propiedad intangible se usa en un país extranjero, las ganancias y utilidades percibidas se consideran como ingresos derivados de 'fuentes fuera de Puerto Rico'." (Énfasis nuestro.)

■ Este pronunciamiento recoge claramente la medida básica a aplicarse para determinar si un ingreso proviene o no de fuentes de Puerto Rico, a saber, el factor predominante constituye el sitio donde real y efectivamente se usa la propiedad intangible que produce los ingresos. Sin embargo, como reconoce Mertens, al formular una respuesta en casos de rentas producidas por intangibles, incorporales o inmateriales ". . . nos acosa el viejo problema de precisar su sitio". 8 *Law Federal Income Taxation*, Sec. 45.35, 135.

Antes de analizar este aspecto, debemos resolver primeramente si el conocimiento técnico especial (*know-how*), constituye *propiedad* bajo la disposición de ley que considera ingresos las rentas y cánones "por usar o el privilegio de usar". La cuestión ha sido limitadamente examinada: Duke, *Foreign Authors, Inventors, and the Income Tax*, 72 Yale L.J. 1092 *et seq.* (1963); Bittker & Ebb, *United States Taxation of Foreign Income & Foreign Person*, (Source of Income), 172–182 (1968). Del estudio de las escasas fuentes disponibles, varios razonamientos nos mueven a concluir en la afirmativa. En el año 1955 se emitió la Opinión Administrativa Núm. 55-17 del Servicio de Rentas Internas Federal que consideramos persuasiva:

"La esencia del contrato es poner a disposición de la corporación doméstica los conocimientos, métodos y experiencia técnica, esto es, el conocimiento técnico especial (*know-how*) de la corporación foránea. Aun cuando el conocimiento técnico especial (*know-how*) de fabricar no es de naturaleza patentable, sí es algo que su poseedor puede conferir a otro por alguna consideración. El derecho a usar tal conocimiento técnico especial (*know-how*) no es materialmente diferente del derecho a usar marcas de fábricas, procesos secretos, fórmulas." (Traducción nuestra.)

También, los intentos definitorios del concepto nos ayudan a reconocer su característica de *propiedad*. "El término no es susceptible de una definición exacta. En su sentido más amplio, puede consistir de inventos, procesos, fórmulas o diseños que no están patentizados o no son patentizables; puede evi-

denciar alguna forma de materia física, tales como planos, dibujos o especificaciones; de manera casi invariable incluye secretos de comercio; y puede envolver experiencia y destreza técnica acumulada, que a lo mejor, o tal vez, sólo puede ser comunicada a través del medio de servicios profesionales." Creed & Bangs, *"Know-How" Licensing & Capital Gains,* 4 Patent, Trademarks & Copyright J. of Research Educ., 93 (1973). Otro autor, siguiendo esta misma línea de pensamiento divide el conocimiento técnico especial (*know-how*) a base de su definición primitiva circunscrita a servicios profesionales hasta su evolución contributiva de propiedad:

"Conocimiento técnico especial (*know-how*) es inherentemente un atributo personal, una idea, una destreza. Es el resultado de entrenamiento, práctica, experimentación y experiencia. Mucho de lo que se denomina conocimiento técnico especial (*know-how*) no puede expresarse tangiblemente por escrito o dibujos. Puede ser el medio a través del cual un técnico diestro, después de años de entrenamiento y constante práctica, hace su trabajo. Ha sido definido como el peritaje técnico y la destreza práctica acumulada que transforma una operación complicada a una eficiente y suave. A menudo ese conocimiento técnico especial ('know-how') solo puede ser comunicado mediante ciertas acciones del técnico; mediante enseñanzas; discusión y demonstración. *En el sentido contributivo, ahí hay solo 'servicios'.*"

.    .    .    .    .    .    .    .

"Hoy en día, conocimientos técnicos especiales (*know-how*) es más que una idea personal, destreza o servicio. Por su uso generalizado, el término abarca un número amplio de renglones que son producto de ideas o destrezas humanas. Algunos ejemplos son diseños, planos, proyectos de plantas, modelos, especificaciones, formulaciones, patrones y procesos." Duffy Frank, *Doing Business Abroad, Use of American Know-how,* 20th Annual N.Y. Institute, (1962) págs. 1269–1270.

Resumiendo, el concepto conocimiento técnico especial (*know-how*) implica la existencia de un conocimiento, destreza, habilidad y maestría, producto de un entrenamiento, práctica y experiencia susceptibles de ser transmitido a otra

persona o aplicado a un objeto. Como tal puede ser valorado y sujeto al comercio de los hombres mediando retribución y cobra sentido estatutario "de propiedad similar" para fines contributivos de la Sec. 119 de la Ley, cuando de la dimensión de lo intangible pasa al mundo de lo corporal a través de un contrato que confiere una licencia de posesión exclusiva y con carácter de monopolio territorial a la obligación de suministrar dicho conocimiento técnico especial (*know-how*).

## III

En el caso de autos hemos visto, que mediante el contrato, Consolidated ofreció, representó y vendió sus conocimientos técnicos especiales (*know-how*) a Caribe y le otorgó una concesión de exclusividad o monopolio de explotación industrial en sus distintas fases, no transferible a otras personas. Es innegable que tal concesión produjo a Consolidated ingresos aquí en Puerto Rico. Estas circunstancias nos mueven a concluir que se trata de una "licencia", tal y como lo reconocieron las partes al así caracterizarlo en las facturas. (*Exhibit* I—demandante). Dailey, *The Concept of the Source of Income*, 15 Tax L. Rev. 415, *et seq*. Estamos ante la explotación industrial de un conocimiento técnico especial (*know-how*) tributable, por originarse en Puerto Rico los ingresos. "Ingresos de regalías por el derecho a usar inventos, patentes o conocimientos técnicos especiales (*know-how*), tienen su fuente, en el país en que está ubicada la propiedad *o se usa la tecnología*". J. White, *International Tax Planning with U.S. Source Rule*, 51 Taxes, The Tax Magazine 216 (1973). (Énfasis nuestro.)

Según los instrumentos, ambas partes aceptaron que la esencia del convenio era el carácter superior e innovador del conocimiento técnico especial (*know-how*) de Consolidated dimanante de su experiencia, originalidad, adaptación, innovación sustancial y mejoras en la *técnica de la manufacturación de tapas, fórmulas y procesos en el control de calidad.*

Por diez (10) años las partes se beneficiaron recíprocamente de dicho conocimiento técnico especial (*know-how*). Por lo tanto, Caribe no puede ampararse en el hecho de que no hubiera patentes o fórmulas secretas durante el período de los contratos, pues ella obtuvo "el derecho a recibir tales patentes o fórmulas secretas."

■ Ahora bien, también la prueba refleja que Consolidated rindió en Brooklyn, Nueva York, los siguientes servicios de asesoría: Ingeniero Vivas y mecánico Camacho durante un período dos (2) y cuatro (4) meses respectivamente; a otros técnicos, asesoramiento y entrenamiento posterior en varias ocasiones; y análisis de laboratorio sobre control de tapas a base de una remisión de muestras semanales. Estos servicios fueron prestados fuera de Puerto Rico y no pueden computarse para fines contributivos como derivados de fuentes dentro de nuestra jurisdicción. Si bien en un enfoque estricto procesal correspondía a Caribe, como reclamante, el peso de la prueba y el aportar la evidencia necesaria para poder computar el valor razonable de tales servicios—y reducirse en la proporción correspondiente de la totalidad de los $120,000.00 pagados a Consolidated—*consideramos de justicia devolver el caso a instancia de modo que dicho foro dilucide este extremo. Wodehouse v. Commissioner*, 178 F.2d 987 (1949). La ausencia de normas, reglamentos e interpretación por el Secretario de Hacienda sobre esta novedosa cuestión así lo justifica.(3)

Los Jueces Asociados Señores Rigau y Martín no intervinieron.

---

(3) Para el tratamiento de este delicado asunto y el examen de alguna de las interrogantes que plantea, véanse: Rev. Rul. 55-17, 1955-1 CB 388; Bittker & Ebb, *op. cit.* 180.